# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
### MILWAUKEE DIVISION

BRADY CORPORATION

and

BRADY WORLDWIDE, INC.

       Plaintiffs,

      v.                   Case No.: 2:24-cv-265

ERIC WOOD

and

TAILORED LABEL PRODUCTS, INC.,

       Defendants.

## COMPLAINT

      Plaintiffs Brady Corporation and Brady Worldwide, Inc. (collectively, "Brady"), by and through their attorneys, for their Complaint against Defendants Eric Wood ("Wood") and Tailored Label Products, Inc. ("TLP") (collectively, "Defendants"), allege as follows:

## <u>INTRODUCTION</u>

      1.     Brady brings this action against Wood and TLP for damages arising out of (1) Wood's breaches of numerous restrictive covenants he agreed to with Brady; (2) Wood's conspiracy with TLP to breach those restrictive covenants; (3) TLP's tortious interference with Wood's contracts with Brady; and (4) Wood's and TLP's misappropriation of Brady's trade secrets in violation of federal and state law. Brady also brings a claim for recoupment against Wood, who

must disgorge profits received from his sale of Brady stock during the period when he engaged in misappropriation of Brady's confidential information and trade secrets.

2. Wood is a former senior-level employee of Brady. In his position, Wood had access to Brady's most sensitive confidential information and trade secrets, including, among other things, information related to Brady's strategic plans, existing and contemplated products, product management, manufacturing methods and tools, research and development, customer usages and requirements, and detailed financials.

3. To protect the confidentiality of this sensitive information, which Brady spent significant time and money generating, Brady required Wood to sign numerous contracts containing confidentiality, non-compete, and non-solicitation restrictions.

4. Within weeks of his separation from Brady on March 1, 2023, Wood flouted those restrictions and accepted a position as President of TLP, an industrial label design company that competes with Brady.

5. Wood has disclosed and used, and is presently using, Brady's confidential information and trade secrets to benefit himself and TLP.

6. Wood's deliberate and intentional misappropriation of Brady's confidential information and trade secrets and breaches of contract have resulted in willful and malicious injury to Brady's rights in its property and business interests.

7. For its part, through its employment of Wood, TLP has acquired and used Brady's confidential information and trade secrets despite knowing, or having reason to know, that Wood acquired such information subject to contractual duties to maintain it in secrecy.

2

8.     Accordingly, Brady brings this action seeking compensatory damages, punitive damages, exemplary damages, attorney's fees, and disgorgement of profits Wood received from his sale of Brady stock.

## PARTIES

9.     Brady is an international manufacturer and marketer of complete solutions that identify and protect people, products, and places. Brady's products help customers increase safety, security, productivity, and performance and include high-performance labels, signs, safety devices, printing systems, and software.

10.     Brady Corporation is a Wisconsin corporation with its principal place of business at 6555 West Good Hope Road, Milwaukee, WI 53223.

11.     Brady Worldwide, Inc. is a Wisconsin corporation with its principal place of business at 6555 West Good Hope Road, Milwaukee, WI 53223.

12.     Eric Wood served as IDS General Manager, Americas from March 2018 until he resigned on November 18, 2022. After Wood resigned from this role, Brady permitted him to serve as Brady's Special Advisor to President of Identification Solutions until his separation date of March 1, 2023.

13.     Wood is a Wisconsin citizen residing at W137N6161 Weyer Farm Court, Menomonee Falls, WI 53051.

14.     TLP is a manufacturer specializing in the design and manufacture of custom labels for customers nationwide.

15.     TLP is a Wisconsin corporation with its principal place of business at N72 W12565 Good Hope Road, Menomonee Falls, WI 53051.

3

## JURISDICTION AND VENUE

16.     This Court has federal-question jurisdiction pursuant to 28 U.S.C. § 1331 because this action includes a claim arising under the laws of the United States—specifically, the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.* ("DTSA").

17.     This Court has supplemental jurisdiction over the state-law claims asserted herein pursuant to 28 U.S.C. § 1367 because those claims arise from the same common nucleus of operative facts as the DTSA claim and form part of the same case or controversy.

18.     This Court has personal jurisdiction over Defendants because Defendants are citizens of Wisconsin.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants reside or are located in this District and a substantial part of the events giving rise to the claims in this action occurred in this District.

20.     Venue is also proper in this District pursuant to the Employee Non-Compete and Non-Disclosure Agreement (the "Employment Agreement") between Brady and Wood. A copy of the Employment Agreement is attached as **Exhibit A**. The Employment Agreement provides that any action "regarding this Agreement shall be brought only in the state or federal courts located in the State of Wisconsin, County of Milwaukee." **Ex. A**, ¶ 12.

## FACTUAL BACKGROUND

### A. Brady's Confidential Information and Trade Secrets

21.     Brady was founded in 1914 in Eau Claire, Wisconsin, as W.H. Brady Co., and renamed Brady Corporation in 1998. Brady began selling products internationally in 1947. In 1984, Brady became a publicly traded company.

22.     Brady has been selling custom label products since the 1950s. During that time, Brady has invested vast time and resources in the research and development of materials science and labeling technology and the improvement of label performance, reliability, manufacture, printing, and design. Additionally, Brady has developed, through significant effort and at great expense, specialized knowledge of its customers' particularized needs for specific labeling applications.

23.     Brady has also invested heavily in advertising and promoting its labeling products, including through in-person demonstrations with customers, educational webinars, printed catalogs, and in educational articles published in print and on the internet. Brady also promotes its labeling products at trade shows and to authorized distributors who promote the products to end users.

24.     As a result of its longevity in the market, significant advertising, strong reputation, and superior products, Brady has enjoyed considerable success in the labeling industry. Indeed, IDS Americas (the division Wood oversaw) was Brady's largest and most profitable division during Wood's tenure with Brady, accounting for approximately one-third of Brady's annual revenue. Further, Brady has built substantial consumer good will associated with itself and its labeling products.

25.     Brady's strategic plans, manufacturing methods, research and development, customer usages and requirements, customer lists, and information related to existing and contemplated products and product management are extremely valuable assets. Such information constitutes highly confidential trade secret information that is not generally known to the public or Brady's competitors, is not obtainable from other sources, was created by Brady at considerable time and expense, and derives substantial independent economic value from not

being known to the public or Brady's competitors and not being readily ascertainable through proper means by persons who can obtain economic value from this information.

26.     Brady takes reasonable measures to protect its valuable confidential information and trade secrets, including by: (A) limiting access to such information to persons with a legitimate business need to know; (B) conducting annual trainings regarding the importance of maintaining the confidentiality of sensitive information and trade secrets; and (C) requiring all persons with access to such information to execute written agreements acknowledging the information as confidential information and trade secrets, agreeing to maintain the confidentiality of the information and to refrain from using the information for any purpose other than in connection with Brady's business, and agreeing not to disclose such information constituting a trade secret for so long as such information constitutes a trade secret. Brady also requires employees with access to such information to agree to robust non-disclosure, non-compete, and non-solicitation restrictive covenants, as described further below.

27.     Brady implemented these reasonable measures with respect to Wood.

**B. Wood's Employment with Brady**

28.     Wood joined Brady on April 24, 2017, in the position of Global Product Management Director, Brand Protection and SmartID. In this position, Wood was responsible for improving product line profitability, defining and implementing Brady's key go-to-market strategies, and guiding the development and launch of new products and services. As Global Product Management Director, Wood had direct access to Brady's confidential information, including Brady's research and development and go-to-market strategies.

29.     In March 2018, Brady promoted Wood to the position of IDS General Manager, Americas.

6

30.     IDS Americas is a division of Brady responsible for specialized labeling products, including lab labels, harsh environment labels, heavy duty labels, and warning and safety labels. IDS Americas was Brady's largest and most profitable division.

31.     In his role as IDS General Manager, Americas, Wood had broad responsibility, including overseeing the division and having full accountability for profits and losses. Wood had access to Brady's confidential information and trade secrets, including, without limitation, customer lists and order requirements, Brady's pricing and cost structure, sales analytics, manufacturing equipment and processes, channel partners, and marketing strategies.

32.     Additionally, Wood had direct involvement with—and influence on—the research and development of Brady's new products and materials and related go-to-market strategies. Through his position, Wood had access to confidential sales information, Brady's strategic plans, and sensitive product information.

33.     Wood also routinely interacted with Brady's largest and most important customers throughout North America and Brazil. Wood frequently traveled to meet with these customers.

**C. Wood's Contracts With Brady**

34.     During his tenure at Brady, Wood signed numerous agreements in which he acknowledged that Brady was giving him access to confidential information and trade secrets and entered into various non-disclosure, non-compete, and non-solicitation covenants. These agreements included a Confidential Information Agreement, an Intellectual Property Agreement, the Employment Agreement, and numerous agreements relating to annual nonqualified stock option grants and restricted stock unit ("RSU") awards (respectively, the "Stock Option

7

Agreements" and the "RSU Agreements"). Brady refers to these agreements collectively as the "Brady-Wood Agreements."

35. On April 24, 2017, Wood executed the Confidential Information Agreement and the Intellectual Property Agreement. A copy of the Confidential Information Agreement is attached as **Exhibit B**. A copy of the Intellectual Property Agreement is attached as **Exhibit C**.

36. In the Confidential Information Agreement, Wood acknowledged that, by the nature of his duties, he would have access to Brady's confidential information, including, without limitation, Brady's trade secrets. Wood further acknowledged that the acquisition of such information by a competitor would injure Brady. **Ex. B**, 1.

37. Wood agreed that, except as required in connection with his duties to Brady, he would not at any time, either directly or indirectly, disclose to others or use for others any such confidential information. **Ex. B**, ¶ 2.A.

38. Further, Wood agreed that, for a period of six months after his termination, he would not provide services, either directly or indirectly, to any of Brady's competitors in connection with the development, manufacture, sale, merchandising, or promotion of competitive products or services. **Ex. B**, ¶ 3.A.

39. Wood also agreed to "notify any prospective employer of the existence of [the Confidential Information Agreement]." **Ex. B**, ¶ 7.

40. Additionally, Wood agreed that, in the event that he breached the Confidential Information Agreement, Brady would be entitled to recover any costs and expenses, including attorney's fees, incurred in enforcing its rights under the agreement. **Ex. B**, ¶ 10.

41. Likewise, in the Intellectual Property Agreement, Wood agreed to "retain in strictest confidence and not use in any form, or disclose to others outside the Company, publish,

or authorize anyone else to disclose or publish, any [confidential information or trade secrets of the Company], except for Company purposes, both during and after my employment for so long as such information is of economic value to the Company or one of its customers, suppliers or associated firms." **Ex. C**, ¶ 3.

42.     The Intellectual Property Agreement further provided that in the event of a breach by Wood of its provisions, Brady would be entitled to recover any costs and expenses, including attorney's fees, incurred in enforcing its rights under the agreement. **Ex. C**, ¶ 3.

43.     In March 2018, Wood was promoted to IDS General Manager, Americas.

44.     On September 4, 2018, Wood executed the Employment Agreement.

45.     Pursuant to the terms of the Employment Agreement, Wood agreed to abide by certain obligations both during and after his employment with Brady. These restrictions were necessary given Wood's senior role within the company and considerable access to Brady's confidential and trade secret information.

46.     In the Employment Agreement, Wood agreed to a post-employment customer non-solicitation provision. That provision provided that, for a period of 12 months following his separation from Brady, he would not contact or assist others in contacting Brady's current customers with whom Wood had significant business contact during the final year of his employment for the purpose of selling or providing products or services competitive with those offered by Brady. **Ex. A**, ¶ 2.

47.     Wood also agreed to a post-employment non-compete provision. Under that provision, Wood agreed that, for a period of 12 months following his separation from Brady, he would not provide services similar to those he had provided to Brady during the final year of his

employment to a competitor of Brady. By its terms, this provision was limited to competitors of Wood's division, IDS Americas. **Ex. A**, ¶ 4.

48.     Wood further agreed to a provision restricting his post-employment work with competitive products. Pursuant to this provision, Wood agreed that, for a period of 12 months following his separation from Brady, he would not work for a competitor of Brady "in the development, design, modification, improvement, or creation of products or services competitive with any products or services with which [Wood] was involved in the development, design, modification, improvement or creation for [Brady]" during the final two years of his employment. **Ex. A**, ¶ 5.

49.     The Employment Agreement also contained a post-employment restriction on accepting positions in which Wood would likely use Brady's confidential information. Under this provision, Wood agreed that, for a period of 12 months following his separation from Brady, he would not "work [for a competitor of Brady] in a position that would likely require the application of, disclosure of, reliance on, or use of [Brady's] Confidential Information." **Ex. A**, ¶ 6.

50.     Wood also agreed to a post-employment restriction on soliciting Brady's employees. Under that provision, Wood agreed that, for a period of 12 months following his separation from Brady, he would not solicit "Key Employees" to work for or provide services similar to those the Key Employee provided to Brady to a competitor of Brady. **Ex. A**, ¶ 8.

51.     Wood received valuable consideration in exchange for agreeing to these restrictive covenants. Wood received new and continuing employment, and he became eligible for certain annual nonqualified stock option grants and restricted stock unit awards.

52.     Wood was offered annual nonqualified stock option grants and RSU awards from 2017-2021. When he accepted these offers, Wood signed the Stock Option Agreements and the

RSU Agreements. Wood was not required to accept these stock options or RSUs as a condition of continuing his employment with Brady.

53.     The Stock Option Agreements and RSU Agreements each contained similar confidentiality, non-solicitation, and non-compete terms, including, without limitation, restrictive covenants prohibiting Wood from using or disclosing Brady's confidential information except in connection with Wood's duties to Brady, requiring Wood to maintain trade secrets in secrecy until such information no longer constituted trade secrets, and prohibiting Wood, upon his separation from Brady, from providing similar services to any of Brady's competitors for a reasonable period of time.

54.     For example, in the 2021 Stock Option Agreement, Wood agreed that, for a period of two years following his separation from Brady, Wood would not use or disclose Brady's confidential information except in connection with his duties for Brady. A copy of the 2021 Stock Option Agreement is attached as **Exhibit D**.[1]

55.     Wood further agreed that he would maintain trade secrets in secrecy for so long as such information constituted a trade secret, regardless of the two-year period. **Ex. D**, ¶ 10.

56.     Wood also agreed to a post-employment customer non-solicitation provision. That provision provided that, for a period of one year following his separation from Brady, he would not contact or assist others in contacting Brady's current customers with whom Wood had significant business contact during the final two years of his employment for the purpose of selling or providing products or services competitive with those offered by Brady. **Ex. D**, ¶ 10.

---

[1] For ease of reference, and because the Stock Option Agreements and RSU Agreements each contain materially similar restrictive covenants, Brady discusses and cites only the 2021 Stock Option Agreement. The other Stock Option Agreements and RSU Agreements that Wood and Brady entered into are attached as **Exhibits E (2018 Stock Option Agreement), Exhibit F (2019 Stock Option Agreement), Exhibit G (2020 Stock Option Agreement), Exhibit H (2018 RSU Agreement), Exhibit I (2019 RSU Agreement), Exhibit J (2020 RSU Agreement), and Exhibit K (2021 RSU Agreement)**.

57.     Wood also agreed to a post-employment non-compete provision. Under that provision, Wood agreed that, for a period of 12 months following his separation from Brady, he would not provide services similar to those he had provided to Brady during the final two years of his employment to a competitor of Brady. **Ex. D**, ¶ 10.

58.     Wood further agreed to a provision restricting his post-employment work with competitive products. Pursuant to this provision, Wood agreed that, for a period of 12 months following his separation from Brady, he would not work for a competitor of Brady "in the development, design, modification, improvement, or creation of products or services competitive with any products or services with which [Wood] was involved in the development, design, modification, improvement or creation for [Brady]" during the final two years of his employment. **Ex. D**, ¶ 10.

59.     In addition, Wood agreed to a post-employment restriction on soliciting employees. Under that provision, Wood agreed that, for a period of 12 months following his separation from Brady, he would not solicit or encourage other Brady employees to provide services to any of Brady's competitors or otherwise terminate their relationships with Brady. **Ex. D**, ¶ 10.

60.     In each year from 2017 through 2021, Wood executed Stock Option Agreements and RSU Agreements granting him stock options or stock units. Thus, in each year of his employment with Brady, Wood agreed to the restrictive covenants contained within those agreements. *See generally* **Exs. D-K**.

61.     Wood's exercises of the Stock Option Agreements and the RSU Agreements were subject to Brady's Incentive Recoupment Policy (the "Recoupment Policy"). A copy of the Recoupment Policy is attached as **Exhibit L.**

62.     Under the Recoupment Policy, Brady is authorized to take action to recoup incentive compensation, such as that paid through Stock Option Agreements and RSU Agreements, if it determines that any participant in an incentive compensation arrangement engaged in misappropriation. **Ex. L, ¶¶ 3(A), 4.**

63.     For purposes of the Recoupment Policy, the determination of whether a participant in an incentive compensation arrangement engaged in misappropriation is left to Brady's "sole and absolute discretion," and Brady's "determinations shall be conclusive and binding on all Participants." **Ex. L, ¶ 3.**

64.     Under the Recoupment Policy, Brady may require that a party to a Stock Option Agreement or RSU Agreement reimburse Brady for all or a portion of any compensation paid under such an agreement during the period in which the misappropriation occurred, and remit to Brady any profits realized from the sale of Brady's common stock during such period.

65.     Through his exercise of rights under the Stock Option Agreements, Wood realized a taxable gain of $109,674.55.

66.     Through the RSU Agreements, Wood was awarded 2,093 shares of Brady stock that subsequently vested. The value of those shares was $96,446 as of their respective vesting dates.

67.     Upon information and belief, Wood sold the shares of Brady stock he acquired through the RSU Agreements and realized a profit. To the extent Wood sold the shares he acquired through the RSU Agreements, he should be required to disgorge any profit realized. To the extent Wood has not sold the shares he acquired through the RSU Agreements, Wood must forfeit such compensation and return the shares to Brady.

68.     Wood also received annual training from Brady regarding the importance of maintaining the confidentiality of sensitive Brady information and trade secrets.

69.     In sum, Wood agreed, numerous times and over the course of several years, to hold Brady's confidential information and trade secrets in secrecy and to refrain from pursuing employment with any of Brady's competitors for a reasonable period following his separation date.

70.     Despite Brady's reasonable efforts to protect its confidential information and trade secrets, Wood flouted the Brady-Wood Agreements upon separating from Brady and thereafter sought to conceal his breaches, as more fully described below.

**D. Wood's Resignation from Brady, Employment with TLP, and Attempts to Conceal that Employment**

71.     On November 17, 2022, Wood entered into the Complete and Permanent Release and Resignation Agreement (the "Resignation Agreement") which provided the terms of his resignation from Brady. A copy of the Resignation Agreement is attached as **Exhibit M**.

72.     On November 18, 2022 (the "Resignation Date"), Wood's resignation from Brady became effective. Following his resignation, Wood remained employed with Brady, serving as Special Advisor to President of Identification Solutions until his separation date of March 1, 2023 (the "Separation Date"). All of Wood's obligations under the Brady-Wood Agreements continued in full force and effect after the Separation Date.

73.     At all times relevant to this matter, Wood was aware of and understood the scope of his non-compete obligations.

74.     Indeed, on January 24, 2023, in between Wood's Resignation Date and his Separation Date, Wood sent an email to Russell Shaller, President and CEO of Brady, requesting a waiver from his non-compete obligations so that he could seek employment with Industrial Label Holdings/Identco ("Identco").

75. Shaller denied Wood's request, stating that Identco's business was "closely aligned" with Brady's.

76. Wood asked Shaller to reconsider. In support of his request, Wood compared Identco to TLP – the entity with which he would ultimately secure new employment in secrecy.

77. Shaller responded by stating that he would do a more thorough assessment regarding Identco.

78. On January 25, 2023, Shaller denied Wood's request for reconsideration because Identco competed with Brady.

79. Although Wood compared Identco to TLP in his correspondence with Shaller, Wood never requested a waiver from Brady to work with TLP.

80. On March 1, 2023, Wood separated from his employment with Brady.

81. Upon information and belief, Wood was named President of TLP no later than April of 2023.

82. Despite his awareness of his non-compete obligations and the other restrictive covenants that he had agreed to, and his efforts to secure a waiver of his non-compete obligations to pursue employment with Identco, Wood never sought a waiver of those non-compete obligations with respect to his employment with TLP.

83. Upon information and belief, Wood did not seek a waiver because he desired to conceal his plans to join TLP and avoid detection by Brady.

84. TLP is a custom adhesive and label company offering, among other things, complex custom industrial labels, high performance labels, advanced die-cut adhesives, and printing technologies. TLP competes with Brady nationally.

85. Wood did not disclose to Brady that he accepted a role as President of TLP.

86.     Wood and TLP have taken steps to conceal Wood's employment with TLP. For instance, Wood has not updated his LinkedIn profile to reflect his new employment, there are no publicly available announcements of his appointment as President, and Wood is not mentioned on TLP's website as of the time of this Complaint.

**E. Wood's Breaches of His Post-Employment Obligations to Brady**

87.     On April 26, 2023, Wood's name was listed on a PowerPoint slide for a business class at Milwaukee School of Engineering, indicating that Wood would appear as a guest speaker for the class the following Monday. The slide included Wood's employment credentials, which listed his current role as "President" of TLP. The PowerPoint listed his most recent job before TLP as "General Manager of Brady Corporation." A copy of the relevant PowerPoint slide is attached as **Exhibit N**. Brady was unaware of the PowerPoint slide – or the identity of Wood's new employer – until January 2024.

88.     On or around April 27, 2023, Shaller learned that Wood had found new employment. Shaller was not aware of the identity of Wood's new employer, however, because Wood did not share that information.

89.     In a letter sent from Brady's General Counsel and Secretary, Andrew Gorman, to Wood dated May 8, 2023, Gorman reminded Wood of his post-employment confidentiality, non-solicitation, and non-compete obligations owed to Brady (the "Post-Employment Reminder Letter"). A copy of the Post-Employment Reminder Letter is attached as **Exhibit O**.

90.     Promptly after learning that Wood's new employment was with TLP, Brady demanded that Wood cease and desist his employment with TLP in a letter dated February 6, 2024. TLP also received a copy of this letter to Wood and received a separate letter from Brady dated February 6, 2024, in which Brady directed TLP to cease and desist from employing Wood

(together with the letter to Wood, the "Cease and Desist Letters"). Copies of the Cease and Desist Letters are attached as **Exhibit P (Cease and Desist Letter to Wood) and Exhibit Q (Cease and Desist Letter to TLP)**.

91. Upon information and belief, Wood has continued his employment with TLP despite the Post-Employment Reminder Letter and the Cease and Desist Letters, both of which reminded Wood of his post-employment obligations to Brady and put TLP on notice of Wood's contractual obligations to Brady.

92. As discussed in the correspondence between Wood and Shaller, TLP is a direct competitor of Brady; thus, Wood's employment as TLP's President means Wood has violated the restrictive covenants in the Brady-Wood Agreements.

93. Upon information and belief, Wood is in possession of and is using Brady's confidential information and trade secrets, including, but not limited to, its strategic plans, its customer lists and order requirements, its pricing and cost structure, sales analytics, manufacturing equipment and processes, channel partners, marketing strategies, information related to existing and contemplated products and product management, research and development, customer usages and requirements, and detailed financials.

94. Upon information and belief, in his position as President of TLP, Wood has disclosed Brady's confidential information and trade secrets to TLP.

95. Upon information and belief, Wood is providing to TLP the same services that he provided to Brady. Given the nature of Wood's responsibilities for TLP, it is probable that Wood has disclosed or will disclose Brady's trade secrets to TLP, whether directly or indirectly.

96. Upon information and belief, TLP knew that Wood had entered into restrictive covenants with Brady that prohibited him from accepting employment as President of TLP.

97.     Upon information and belief, TLP disregarded these restrictive covenants when it decided to employ Wood, as evidenced by TLP's active concealment of Wood's employment by, among other things, failing to announce Wood's employment and failing to list Wood on its website. Alternatively, TLP failed to meaningfully investigate these restrictive covenants when it decided to employ Wood, even though TLP knew that Wood's last employment position was with Brady.

98.     Upon information and belief, TLP has acquired, through its employment of Wood, knowledge of Brady's confidential information and trade secrets, including, but not limited to, Brady's strategic plans, its customer lists and order requirements, its pricing and cost structure, sales analytics, manufacturing equipment and processes, channel partners, marketing strategies, information related to existing and contemplated products and product management, research and development, customer usages and requirements, and detailed financials.

99.     Upon information and belief, Wood and TLP are using Brady's confidential information and trade secrets, in violation of the Brady-Wood Agreements and in violation of state and federal law prohibiting misappropriation of trade secrets.

100.    Upon information and belief, at the time of TLP's use of Brady's confidential information and trade secrets, TLP knew or had reason to know that Wood acquired the confidential information and trade secrets he brought to TLP subject to contractual duties not to use or disclose such confidential information and trade secrets following his separation from Brady.

101.    Upon information and belief, at the time of TLP's use of Brady's confidential information and trade secrets, TLP knew or had reason to know that Wood had a duty to Brady to maintain in secrecy the confidential information and trade secrets that Wood brought to TLP.

102. Upon information and belief, Wood has improperly used and/or disclosed Brady's trade secrets, and this misappropriation constitutes a breach of the Brady-Wood Agreements and violates DTSA and the Wisconsin Trade Secrets Act, Wis. Stat. § 134.90 ("WITSA").

103. Upon information and belief, TLP has improperly acquired and used Brady's trade secrets, and this misappropriation violates DTSA and WITSA.

## COUNT ONE
## BREACH OF CONTRACT AGAINST WOOD

104. Paragraphs 1-103 above are re-alleged and incorporated by reference as though fully set forth herein.

105. In exchange for valuable consideration, Wood executed the Brady-Wood Agreements, all of which contained post-employment restrictive covenants.

106. As part of the Brady-Wood Agreements, Wood agreed to post-employment customer non-solicitation provisions, post-employment non-compete provisions, provisions restricting his post-employment work with competitive products, provisions restricting his post-employment acceptance of positions where he would likely use Brady's confidential information and trade secrets, and provisions restricting his post-employment solicitation of Brady employees.

107. Under the Employment Agreement, Wood agreed that for twelve (12) months following his separation from Brady, he would not, "within the United States, provide services similar to those [he] provided to [Brady] during the last year of [his] employment with [Brady] to a competitor of [Brady] or to a person or entity planning to compete with [Brady]." **Ex. A**, ¶ 4.

108. Under the Stock Option Agreements and the RSU Agreements, Wood agreed that for twelve (12) months following his separation from Brady, he would not "directly or indirectly, within the United States, provide services similar to any of those [he] provided to [Brady] during

the last two (2) years of [his] employment with [Brady] to a competitor of [Brady] or a person or entity preparing to compete with [Brady]." **Ex. D**, ¶ 10.

109. By accepting employment with TLP—a business in direct competition with Brady nationally—as its President, as described above, Wood breached the Brady-Wood Agreements.

110. Under the Employment Agreement, Wood agreed that for twelve (12) months following his separation from Brady, he would not, "within the United States and for a competitor of [Brady] (or to a person or entity planning to compete with [Brady]), work in the development, design, modification, improvement, or creation of products or services competitive with any products or services with which [Wood] was involved in the development, design, modification, improvement or creation for [Brady] during the last two (2) years of [Wood's] employment." **Ex. A**, ¶ 5.

111. Under the Stock Option Agreements and the RSU Agreements, Wood agreed that for twelve (12) months following his separation from Brady, he would not "work in the development, design, modification, improvement, or creation of products or services competitive with any products or services with which [he] was involved in the development, design, modification, improvement or creation for [Brady] during the last two (2) years of [his] employment." **Ex. D**, ¶ 10.

112. By working for TLP as its President, a role in which Wood was likely to oversee the creation of TLP's products and services, Wood breached the Brady-Wood Agreements.

113. Under the Employment Agreement, Wood agreed that for twelve (12) months following his separation from Brady, he would not, "within the United States, work in a position that would likely require the application of, disclosure of, reliance on, or use of [Brady's]

Confidential Information for a competitor of [Brady] or to a person or entity planning to compete with [Brady]." **Ex. A**, ¶ 6.

114.    Under the Stock Option Agreements and the RSU Agreements, Wood promised and agreed that for two (2) years following his separation from Brady, he would not "use or disclose [Brady's] Confidential Information except as necessary in executing [his] duties for [Brady]." **Ex. D**, ¶ 10.

115.    By working for TLP as its President, Wood is likely to use, disclose, or otherwise rely on his knowledge of Brady's confidential information and has thus breached the Brady-Wood Agreements.

116.    As a result of Wood's breaches of contract, Brady has suffered damages, in an amount to be determined at trial.

<u>**COUNT TWO**</u>
<u>**CIVIL CONSPIRACY AGAINST WOOD AND TLP**</u>

117.    Paragraphs 1-116 above are re-alleged and incorporated by reference as though fully set forth herein.

118.    By their wrongful acts as described above, Wood and TLP, jointly and severally, formed and operated a conspiracy to, among other things, employ Wood to utilize Wood's knowledge of Brady's confidential information and business strategies to benefit TLP as a competing enterprise.

119.    As a direct result of said wrongful acts by and in conformance with said conspiracy, Brady has suffered damages, in an amount to be determined at trial, for which Wood and TLP are jointly and severally liable.

## COUNT THREE
## TORTIOUS INTERFERENCE WITH CONTRACTUAL
## OBLIGATIONS AGAINST TLP

120.    Paragraphs 1-119 above are re-alleged and incorporated by reference as though fully set forth herein.

121.    Upon information and belief, at the time it hired Wood, TLP was aware of the Brady-Wood Agreements and had an obligation not to interfere with those contracts, including with respect to Wood's post-employment contractual obligations.

122.    TLP intentionally and without justification or privilege interfered with Wood's contracts with Brady, and particularly with respect to Wood's post-employment contractual obligations, by employing Wood, continuing to employ Wood, and assisting Wood in concealing from Brady his relationship with TLP.

123.    TLP's actions were malicious and undertaken with an intentional disregard of Brady's rights, entitling Brady to punitive damages.

124.    As a direct result of TLP's actions, Brady has suffered damages, in an amount to be determined at trial.

## COUNT FOUR
## VIOLATION OF DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836, *et seq.* AND
## VIOLATION OF WISCONSIN TRADE SECRETS ACT, WIS. STAT. § 134.90
## AGAINST WOOD AND TLP

125.    Paragraphs 1-124 above are re-alleged and incorporated by reference as though fully set forth herein.

126.    Brady has trade secrets, including, but not limited to, its strategic plans, its customer lists and order requirements, its pricing and cost structure, sales analytics, manufacturing equipment and processes, channel partners, marketing strategies, information related to existing

and contemplated products and product management, research and development, customer usages and requirements, and detailed financials.

127.     Brady takes efforts that are reasonable under the circumstances to maintain the secrecy of its trade secrets.

128.     Wood acquired Brady's trade secrets under contractual duties not to use or disclose such trade secrets following his separation from Brady, as fully set forth in the Brady-Wood Agreements.

129.     Wood agreed that he would maintain Brady's trade secrets in confidence for so long as such information constituted a trade secret, regardless of the temporal limits on the other restrictive covenants he agreed to.

130.     Upon information and belief, Wood is in possession of and is using Brady's trade secrets, including, but not limited to, its strategic plans, its customer lists and order requirements, its pricing and cost structure, sales analytics, manufacturing equipment and processes, channel partners, marketing strategies, information related to existing and contemplated products and product management, research and development, customer usages and requirements, and detailed financials.

131.     Upon information and belief, Wood has disclosed Brady's trade secrets to TLP, in violation of the Brady-Wood Agreements.

132.     Upon information and belief, Wood is providing to TLP the same services that he provided to Brady. Given the nature of Wood's responsibilities for TLP, it is probable that Wood has disclosed or will disclose Brady's trade secrets to TLP, whether directly or indirectly.

133. At the time of Wood's disclosure of Brady's trade secrets to TLP, Wood knew that his knowledge of such information was acquired under a duty to maintain such information in secrecy, as fully set forth in the Brady-Wood Agreements.

134. The trade secrets in Wood's and TLP's possession are not stale. Such information is not generally known to the public or Brady's competitors, is not readily obtainable from other sources, was generated by Brady at considerable time and expense, and derives substantial economic value from not being generally known to the public or Brady's competitors.

135. Upon information and belief, TLP knew that Wood had entered into restrictive covenants with Brady that prohibited him from accepting employment as President of TLP.

136. Upon information and belief, TLP disregarded these restrictive covenants, or otherwise failed to meaningfully investigate them when TLP decided to employ Wood.

137. Upon information and belief, TLP has used, and is using, Brady's trade secrets that it acquired through its employment of Wood.

138. Upon information and belief, at the time of TLP's use of Brady's trade secrets, TLP knew or had reason to know that Wood acquired the trade secrets he brought to TLP under contractual duties not to use or disclose such trade secrets following his separation from Brady for so long as such information constituted a trade secret.

139. Upon information and belief, at the time of TLP's use of Brady's trade secrets, TLP knew or had reason to know that Wood had a duty to Brady to maintain in secrecy or limit the use of the trade secrets that Wood brought to TLP.

140. Under DTSA and WITSA, any actual or threatened misappropriation of a trade secret is actionable.

141.    Upon information and belief, Wood has improperly retained and disclosed and/or used Brady's trade secrets, and this misappropriation violates DTSA and WITSA.

142.    Upon information and belief, TLP has improperly acquired and used Brady's trade secrets, and this misappropriation violates DTSA and WITSA.

143.    Under DTSA and WITSA, Brady is entitled to an award of damages for actual loss caused by the misappropriation of the trade secret and for Wood's and TLP's unjust enrichment caused by the misappropriation.

144.    Wood's threatened use and disclosure of Brady's trade secrets is willful and malicious, in that Wood intentionally misappropriated the information with conscious disregard for the restrictive covenants he had agreed to and sought to conceal his new employment with TLP to avoid detection.

145.    TLP's threatened use of Brady's trade secrets is also willful and malicious, in that TLP aided Wood in obscuring his employment with TLP and knew of or should have meaningfully investigated the restrictive covenants that Wood had agreed to with Brady.

146.    As a result of Wood's and TLP's willful and malicious misappropriation, Brady is entitled to exemplary damages and its reasonable attorney's fees incurred in connection with the misappropriation.

**COUNT FIVE**
**RECOUPMENT AGAINST WOOD**

147.    Paragraphs 1-146 above are re-alleged and incorporated by reference as though fully set forth herein.

148.    During his employment with Brady, Wood received annual nonqualified stock option grants and RSU awards from 2017-2021.

149.     Wood exercised his rights under the Stock Option Agreements and realized a taxable gain of $109,674.55.

150.     Through the RSU Agreements, Wood was awarded 2,093 shares of Brady stock that subsequently vested. The value of those shares was $96,446 as of their respective vesting dates.

151.     Upon information and belief, Wood sold the shares of Brady stock he acquired through the RSU Agreements and realized a profit.

152.     Wood's exercises of the Stock Option Agreements and the RSU Agreements were subject to Brady's Recoupment Policy.

153.     Pursuant to the Recoupment Policy, Brady has determined, in its sole and absolute discretion, that Wood engaged in misappropriation of Brady's confidential information and trade secrets.

154.     Pursuant to the Recoupment Policy, Wood is required to disgorge the profits realized from his sale of Brady stock received pursuant to the Stock Option Agreements.

155.     Pursuant to the Recoupment Policy, to the extent Wood sold the shares he acquired through the RSU Agreements, he should be required to disgorge any profit realized. To the extent Wood has not sold the shares he acquired through the RSU Agreements, Wood must forfeit such compensation and return the shares to Brady.

**WHEREFORE**, Brady prays that the Court:

A.     Enter judgment in Brady's favor on all of its claims against the Defendants;

B.     Award Brady compensatory damages, with interest;

C.     Award Brady punitive damages;

D.     Award Brady exemplary damages for willful and malicious misappropriation under 18 U.S.C. § 1836(b)(3)(C) and Wis. Stat. § 134.90(4)(b);

E.    Award Brady its reasonable attorney's fees based on willful and malicious misappropriation under 18 U.S.C. § 1836(b)(3)(D) and Wis. Stat. § 134.90(4)(c);

F.    Award Brady its reasonable attorney's fees based on the Confidential Information Agreement, ¶ 10 and the Intellectual Property Agreement, ¶ 7;

G.    Order Wood to disgorge any profits realized through his sale of shares of Brady common stock that he obtained through annual nonqualified stock option grants and RSU awards;

H.    Order TLP to disgorge any profits realized through its use of Brady's confidential information or trade secrets; and

I.    Grant Brady such further and other relief as the Court deems proper.


Dated this 28th day of February, 2024.

HUSCH BLACKWELL LLP
Attorneys for Plaintiffs Brady Corporation and
Brady Worldwide, Inc.


By:    /s/ Jason R. Fathallah
       Jason R. Fathallah (Wis. SBN 1060040)
       Dieter J. Juedes (Wis. SBN 1088880)
       HUSCH BLACKWELL LLP
       511 N. Broadway, Suite 1100
       Milwaukee, Wisconsin 53202
       Telephone:  414.273.2100
       Fax:  414.223.5000
       Email: jason.fathallah@huschblackwell.com
              dieter.juedes@huschblackwell.com

       AJ Fabianczyk (Wis. SBN 1101448)
       HUSCH BLACKWELL LLP
       33 East Main Street, Suite 300
       Madison, WI 53703
       Telephone: 608.255.4440
       Fax: 608.258.7138
       Email: aj.fabianczyk@huschblackwell.com